UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE 2004 STUART MOLDAW TRUST,
Norman Ferber Trustee; SUSAN MOLDAW,
Executor of the Estate of Stuart Moldaw;
PHYLLIS MOLDAW, an individual,

                         Plaintiffs,                    08 Civ. 9421 (PKC)

            -against-
                                                        MEMORANDUM AND ORDER

XE L.I.F.E., LLC, a limited liability company;
and XE CAPITAL MANAGEMENT, LLC, a
limited liability company,

                         Defendants.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

             In 2004, Stuart Moldaw and his wife Phyllis were approached by their

longtime estate-planning advisor with an interesting proposal: a group of investors would

pay the couple a total of $4 million in exchange for their obtaining a number of insurance

policies on their lives.[1]  Advised by accountants and legal counsel, Stuart and Phyllis

decided to participate in the plan.  In or about 2004, ten to twelve policies were issued to

insure Stuart's life, with coverage totaling $78 million.  After Stuart died in May 2008,

his estate executor and widow remained silent while the insurance carriers paid policy

proceeds to the investors.  The estate, the widow and an entity identified as The 2004

---

[1] There is a growing market for this type of "stranger-owned life insurance," sometimes referred to as "death bonds."  See J. Alan Jensen & Stephan R. Leimberg, Stranger-Owned Life Insurance: A Point/Counterpoint Discussion, 33 ACTEC J. 110, 110, 120 (2007).  In such a transaction, the insured individual is compensated for obtaining and transferring the policy and the term policy is almost always renewed by the purchaser until the insured dies and policy proceeds are paid to the investors.  Id. at 111-12. The secondary market for these policies is estimated to have grown from $200 million in 1998 to $12 billion in 2005.  Id. at 111.

Stuart Moldaw Trust, all domiciled in California, have now sued the principal investor groups, domiciled in New York, to recover the insurance payments.[2]  Plaintiffs rely principally on a New York statute that grants to the administrator or executor of an estate the right to sue someone who procures a policy on another's life without having an insurable interest.  N.Y. Ins. L. § 3205(b).

 Defendants move to dismiss the Complaint on various grounds, pursuant to Rule 12(b)(6), Fed. R. Civ. P.  As explained below, the motion is granted because California law, and not New York law, governs Claims One and Two; under California law, only the insurer has the right to sue a person who has received insurance proceeds but holds no insurable interest.  In addition, Claim Three, which is asserted by Phyllis under California's community property law, California Family Code § 1100(b), is time-barred because Stuart's transfer of the policies occurred more than three years before commencement of the action.  Finally, Claims Four and Five, which seek equitable relief based on the other claims, are dismissed because the other claims fail.

BACKGROUND

 For the purposes of this motion to dismiss, the allegations set forth below are accepted as true, with the exception of legal conclusions couched as factual allegations.  See Iqbal v. Ashcroft, 129 S. Ct. 1937, 1949-50 (2009).  All reasonable

---

[2] Jurisdiction is invoked by reason of diversity of citizenship. 28 U.S.C. § 1332. Because the defendants are limited liability companies ("LLCs") and not corporations, I entered an order requiring the plaintiff to amend to set forth the citizenship of all constituent members of the LLCs.  (Order of Nov. 8, 2008.)  See Handelsman v. Bedford Village Assocs. Ltd. Partnership, 213 F.3d 48, 51-52 (2d Cir. 2000) (citing Cosgrove v. Bartolotta, 150 F.3d 729, 731 (7th Cir.1998)); Strother v. Harte, 171 F. Supp. 2d 203, 205 (S.D.N.Y. 2001) ("For purposes of diversity jurisdiction, a limited liability company has the citizenship of each of its members.").   The sole members of the two LLCs are either a natural person citizen of New York or another LLC which, in turn, has as its sole member a natural person who is a citizen of New York. (Second Amended Complaint (the "Complaint") ¶¶ 15-16.)

inferences are drawn in the plaintiffs' favor as the non-movants.  United States v. City of New York, 359 F.3d 83, 91 (2d Cir. 2004), cert. denied, 543 U.S. 1146 (2005).

     A.  The Parties.

     This action is directed toward what the plaintiffs describe as the defendants' "illegal wagers on the life of Stuart G. Moldaw."  (Compl. ¶ 1.)  Stuart Moldaw died in California on May 24, 2008, at age 81.  (Compl. ¶¶ 13, 50.)

     Defendant XE Capital Management, LLC ("XE Capital") is an asset management and hedge fund and the sole member of defendant XE L.I.F.E. LLC ("XE Life").  (Compl. ¶¶ 15-16.)  Randall K. Kau, a New York citizen, is the sole member of XE Capital, and XE Capital is the sole member of XE Life.  (Compl. ¶¶ 15-16.) According to the plaintiffs, the defendants arranged for life insurance policies to issue on the life of Stuart Moldaw, for which they paid Stuart $2 million, under the premise that the payments to Stuart and the policy premiums would be less than the benefits to be realized upon payment at Stuart's death.  (Compl. ¶¶ 4-5.)  According to the defendants, "ten or twelve" policies were issued on Stuart's life by "four or five" different carriers. (July 22 Tr. at 24.)  The policies provided for payment of approximately $78 million upon Stuart's death, and were written in or about 2004.  (Compl. ¶ 4; Nawaday Dec. Exs. A, B.)  Defendants and their co-conspirators allegedly paid all policy premiums, and Stuart Moldaw paid none.  (Compl. ¶¶ 4, 32, 62, 79, 106.)

     Plaintiff Susan Moldaw is the executor of the estate of Stuart Moldaw (the "Executor").  (Compl. ¶ 13.)  She resides in California.  (Compl. ¶ 13.)  In both the caption and the body of the Complaint, she is identified in her capacity as estate executor, and not in any individual capacity.  (Compl. ¶¶ 6, 13.)  Plaintiff Phyllis Moldaw is

- 4 -

Stuart's widow, and resides in California.  (Compl. ¶¶ 14, 27.)  The third plaintiff is The

2004 Stuart Moldaw Trust (the "Trust"), which is identified as an irrevocable trust

organized under California law.  (Compl. ¶ 12.)  Its trustee, Normal Ferber, resides in

California.  (Compl. ¶ 12.)  The Trust was formed as an unfunded trust on December 13,

2004, and, according to the Complaint, is "the rightful beneficiary of the Policies."

(Compl. ¶¶ 6, 44.)

       Plaintiffs contend that the Court should order defendants to pay to the

Trust any proceeds from the policies; grant declaratory relief declaring the Trust the

rightful beneficiary of the policies, as well as imposition of a constructive trust and an

accounting; or, alternatively, order the defendants to pay the Executor all proceeds "for

transfer to the 2004 Stuart Moldaw Trust . . . ."  (Compl. ¶¶ 126-30, 142-44.)   Elsewhere,

the Complaint states that if the insurance proceeds are returned to the Trust, the plaintiffs

"agree to repay" the $4 million cumulatively received by Stuart and Phyllis as

compensation for their participation in the transaction.  (Compl. ¶ 6; see also July 22 Tr.

at 44 ("If we prevail on this, we recognize that [keeping the $4 million]  would be

inequitable and we would hand back the 4 million, and that's in our complaint.").)

       B.  The Life Insurance Policies and Related Transactions.

       According to the Complaint, non-party "conspirators" initiated the chain

of events that culminated in this action.  The Complaint alleges that Mark Ross, the

principal owner of a firm called Mark Ross & Co. ("MR & Co."), advised Stuart Moldaw

on life insurance and estate-planning matters for a period of about 10 years.  (Compl. ¶¶

18-19, 27.)  Ross first proposed a transaction through which Stuart and Phyllis Moldaw

would be paid $4 million in exchange for a series of insurance policies to be issued on

their lives, after which the life insurance policies would be sold to investors.  (Compl. ¶¶ 26, 28.)  According to the Complaint, the Moldaws had no need or desire for additional insurance, but the defendants presented the proposal as a way for the Moldaws to make money with little risk.  (Compl. ¶ 29.)

During a series of meetings in fall 2004, which were attended at least in part by Stuart, his accountant, and his attorney from the Heller Ehrman law firm, it was concluded that approximately $78 million in life insurance coverage could be written on the lives of both Stuart and Phyllis, without any premium payments from Stuart or Phyllis.  (Compl. ¶¶ 30-32.)  All costs associated with the transaction were to be incurred by the defendants and/or MR & Co.  (Compl. ¶ 32.)  Stuart agreed to proceed with the transaction, the effects of which the Complaint describes as follows:

> [T]he Moldaws would earn $4 million in exchange for participating in the deal.  Specifically, Ross explained that upon the issuance of the insurance policies on the lives of Stuart and Phyllis, Defendant XE Life and/or the other Defendants would pay Stuart and Phyllis a total of $4 million as consideration for their agreeing to become the insured lives and, in effect, giving up their rights to secure insurance coverage that they could otherwise own on their lives.

(Compl. ¶ 33.)

According to the Complaint, the structure of the transaction was complex, since defendants were "[a]pparently aware of the legal prohibition of transactions by which a person is paid to take out insurance upon his or her life for the benefit of a stranger . . . ."  (Compl. ¶ 35.)  "[A] complicated scheme" was orchestrated to work around that statutory prohibition, using unfunded trusts, limited liability companies and financing agreements.  (Compl. ¶ 35.)  Once formed, the trusts and LLCs had no assets other than the life insurance policies.  (Compl. ¶ 36.)  The Complaint alleges that "the

Defendants would make 'loans' to the trusts and/or the [LLCs] in the form of an agreement to pay the premiums due on the policies" in exchange for secured interest in the life insurance policies.  (Compl. ¶ 36.)  According to the Complaint, once the loans expired, the defendants were to take ownership of the policies.  (Compl. ¶ 36.)  The Complaint alleges that policies on the lives of Stuart and Phyllis were first purchased on October 6, 2004, with the LLCs and trusts named as beneficiaries and the premiums paid directly by the defendants.  (Compl. ¶ 37.)

The Complaint asserts that in or about October 2004, the defendants, via Mark Ross, informed Stuart that they could not immediately pay Stuart and Phyllis the promised $4 million.  (Compl. ¶ 40.)  Instead, payment would be contingent on the expiration of a two-year "incontestability period," after which the policies on their lives would be available for sale.  (Compl. ¶ 40.)  At Stuart's suggestion, the defendants placed $4 million in escrow, payable to Stuart and Phyllis at the close of the incontestability period.  (Compl. ¶¶ 40-41.)  Ross promised Stuart that any sales transactions "would be undertaken so as to protect the names of Stuart and Phyllis as the insureds from the possible beneficial buyers of the insurance policies on their lives."[3]  (Compl. ¶ 41.)  An escrow agreement was entered between Stuart, Phyllis, XE Life and JP Morgan Trust Company, National Association of New York.  (Compl. ¶ 45.)  New LLCs and trusts formed as part of the transaction's restructuring.  (Compl. ¶¶ 42-44.)  One of these new trusts was plaintiff The 2004 Stuart Moldaw Trust.  (Compl. ¶ 44.)

Ultimately, defendants XE Capital and XE Life acquired ownership over the Moldaw life insurance policies, following a "struggle" with MR & Co. and XE-R that

---

[3] Such promises are commonly made as part of a stranger-owned life insurance transaction, due, in part, to concern that a policy's owner may wish to visit harm upon an insured, from whose death the policy owner stands to profit.  See Jensen & Leimberg, 33 ACTEC J., at 117-19.

occurred "in less than amicable circumstances." (Compl. ¶ 48.) The defendants made no effort to sell the insurance policies during the two-year incontestability period, and Stuart and Phyllis each received $2 million, plus interest, from the escrow account. (Compl. ¶ 49.) According to the Complaint, litigation followed between Ross and the defendants, which is ongoing. (Compl. ¶ 50.)[4]

The plaintiffs commenced this action on November 3, 2008. As explained in the Complaint, "[t]he instant action does not arise out of the Policies themselves and does not seek to have those Policies voided or otherwise reformed." (Compl. ¶ 51.) Rather, the Complaint seeks relief directed toward what it broadly refers to as "the Transaction" – the purchase of Stuart's life insurance policies by entities with no insurable interest in his life. (Compl. ¶¶ 35, 51.) According to the Complaint, the defendants violated New York Insurance Law § 3205 by causing life insurance policies to be issued solely for the benefit of the defendants rather than for the benefit of persons with an insurable interest. Claim One alleges violation of New York Insurance Law § 3205(b)(2), which prohibits a person without an insurable interest from procuring or causing to be procured an insurance policy on the life of another; Claim Two alleges violation of New York Insurance Law § 3205(b)(1), which permits individuals to procure an insurance policy on their own lives; and Claim Three alleges violation of California

---

[4] The Complaint does not identify by caption or jurisdiction where any such litigation is pending, and according to the defendants, all such actions have now been dismissed. (July 22 Tr. at 22.) On November 12, 2008, Justice Charles Ramos of the Supreme Court of the State of New York, New York County, entered judgment in the matter of XE Capital Management, LLC v. XE-R, LLC, R2004, LLC, Mark Ross & Co., Inc. and Mark E. Ross, Index No. 602336/2008. The judgment confirmed an arbitration award granted to XE Capital in the amount of $9,133,308.80, plus expenses and court costs. The defendants' motion papers include an affidavit executed by Stuart Moldaw in October 2006, in the matter of XE-R, LLC v. XE Capital Management, LLC, 603658/2006 (N.Y. Sup. Ct. N.Y. Cty.). There has been at least one other action in the Supreme Court of the State of New York, New York County, that include as parties the entities alleged to be involved in the Moldaw transactions. See Mark Ross & Co., Inc. and Mark E. Ross, Individually v. XE Capital Management, LLC, 104935/2007 (N.Y. Sup. Ct. N.Y. Cty.).

Family Law § 1100(b), which requires written consent of a spouse prior to disposing or giving away community property for less than fair and reasonable value.  Claim Four seeks declaratory relief and Claim Five requests the Court to order a constructive trust and an accounting.

As to relief, the plaintiffs seek disgorgement of the insurance proceeds from the defendants and claim that any proceeds should be placed in the Trust as the rightful beneficiary.  (Compl. ¶ 6.)  They also propose alternative equitable remedies whereby Phyllis Moldaw or the Executor would receive the policy benefits.  (Compl. ¶¶ 7-11.)  The Complaint does not allege breach of contract or fraud claims.

STANDARD GOVERNING A MOTION TO DISMISS

Rule 8(a)(2), Fed. R. Civ. P., requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (ellipsis in original).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must provide the grounds upon which the claims rest, through factual allegations sufficient to raise a right to relief above the speculative level.  ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 127 S.Ct. at 1965).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949.  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.

Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" do not suffice to state a claim, as "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1949-50.

The Supreme Court has described the motion to dismiss standard as encompassing a "two-pronged approach" that requires a court first to construe a complaint's allegations as true, while not bound to accept the veracity of a legal conclusion couched as a factual allegation. Id. Second, a court must then consider whether the complaint "states a plausible claim for relief," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Although the Court is limited to facts as stated in the complaint, it may consider exhibits or documents incorporated by reference without converting the motion into one for summary judgment. See Int'l Audiotext Network, Inc. v. Am. Telephone & Telegraph Co., 62 F.3d 69, 72 (2d Cir. 1995).


DISCUSSION

I.    California Law Governs and the Plaintiffs' Claims Brought Under the New
      York Insurance Law Are Dismissed.

Plaintiffs assert that New York Insurance Law § 3205 governs Claims One and Two, and that the statute has been violated. Defendants argue that New York law is inapplicable and that California law is controlling.

In this diversity action, the Court must apply the choice of law rules of New York, the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the

jurisdictions involved."  Matter of Allstate Ins. Co. (Stollarz), 81 N.Y.2d 219, 223

(1993).

      A.     An Actual Conflict Exists Between the Laws of California and New York
              as to Whether the Plaintiffs Have a Right to Bring Suit.

      For the purposes of this motion, the central inquiry is whether the two

states' laws conflict as to the plaintiffs' right to bring an action to recover the proceeds of

a policy on the life of Stuart Moldaw from persons who have no insurable interest.  I

conclude that such a conflict exists.

      The laws of California and New York both limit the categories of persons

who may own an insurance policy on the life of another.  New York statute provides that

an individual may "on his own initiative procure or effect" a policy on his own life "for

the benefit of any person, firm, association or corporation."  N.Y. Ins. L. § 3205(b)(1).

Thus, under the plain language of the statute, Stuart could, on his own initiative, make

someone with no insurable interest a beneficiary under the policy.  See, e.g., Hota v.

Camaj, 299 A.D.2d 453, 453 (2d Dep't 2002) (section 3205(b)(1) "permits any person of

lawful age who has procured a contract of insurance upon his or her own life to

immediately transfer or assign the contract, and does not require the assignee to have an

insurable interest."); Corder v. Prudential Ins. Co., 248 N.Y.S.2d 265, 266 (N.Y. Sup. Ct.

Erie Cty. 1964) ("Where the deceased effects the insurance upon her own life, it is well-

established law that she can designate any beneficiary she desires without regard to

relationship or consanguinity.").  A different rule pertains if a person with no insurable

interest causes the insured to obtain a policy naming that person as beneficiary.  Section

3205(b)(2) states that "[n]o person shall procure or cause to be procured, directly or by

assignment or otherwise any contract of insurance upon the person of another unless the

benefits under such contract are payable to the person insured or his personal

representatives, or to a person having, at the time when such contract is made, an

insurable interest in the person insured."  An opinion issued on December 19, 2005 by

the New York State Insurance Department concluded that section 3205 makes it unlawful

for an investor "to facilitate the procurement of [life insurance] policies solely for

resale."[5]  As Judge Chin has observed, "[f]ederal and New York courts have continuously

criticized attempts to evade the insurable interest rule."  Life Prod. Clearing, LLC v.

Angel, 530 F. Supp. 2d 646, 653 (S.D.N.Y. 2008).

California similarly limits ownership of a life insurance policy:  "If the

insured has no insurable interest, the contract is void."  Cal. Ins. Code § 280.  A separate

provision specifies that "[a] policy executed by way of gaming or wagering, is void."

Cal. Ins. Code § 252.  The effect of section 252 has been described as follows: "The law

is clear that a person taking out a policy of insurance upon the life of another must have

an insurable interest in the life of the other person.  Otherwise, the policy is a mere wager

on the life of the person insured, and the policy is void as against public policy."  Jimenez

v. Protective Life Ins. Co., 8 Cal. App. 4th 528, 536 (Cal. Ct. App. 4th Dist. 1992) (citing

Cal. Ins. Code §§ 252, 280).  In August 2008, the California Department of Insurance

issued an advisory warning (the "California Advisory") against participation in stranger-

owned life insurance, which it also described as "Speculator Initiated Life Insurance."  It

noted, among other things, that "[o]ne cannot take out a life insurance policy on a perfect

stranger."[6]

"Gambling" or "wagering" on the life of another through an insurance

---

[5] Available at http://www.ins.state.ny.us/ogco2005/rg051215.htm.
[6] Available at http://www.insurance.ca.gov/0150-seniors/0100alerts/strangerownedlifeins.cfm.

policy has long been disfavored in American law.  As Justice Holmes has stated, "[a]
contract of insurance upon a life in which the insured has no interest is a pure wager that
gives the insured a sinister counter interest in having the life come to an end."  Grigsby v.
Russell, 222 U.S. 149, 154 (1911).  "The very meaning of an insurable interest is an
interest in having the life continue . . . ."  Id. at 155; see also N.Y. Ins. Law § 3205(a)(1)
(defining insurable interest as including "a substantial interest engendered by love and
affection" as well as "a lawful and substantial economic interest in the continued life,
health or bodily safety of the person insured, as distinguished from an interest which
would arise only by, or would be enhanced in value by, the death, disablement or injury
of the insured.").[7]

       While California and New York both limit who may lawfully own insurance
on the life of another, they conflict as to who has a right of action to vindicate a violation
of the statute.  Section 3205(b)(4) of the New York Insurance Law empowers the person
insured or his "executor or administrator" to bring action "to recover such benefits from
the person receiving them."  It appears that pursuant to section 3205(b)(4), neither the
Trust nor Phyllis is an appropriate plaintiff under the statute.  California Insurance Code
§ 252 is silent as to who may sue to enforce its terms, but the state does have a general
requirement that "[e]very action must be prosecuted in the name of the real party in
interest, except as otherwise provided by statute."  Cal. Code. Civ. P. § 367.  Section 367
has been interpreted to give parties the right to sue "if they or someone they represent
have either suffered or are threatened with an injury of sufficient magnitude to reasonably

---

[7] Stranger-owned life insurance also has been described as "theft by deception, a fraud on the insurer,"
since it often requires evasions and omissions on a policy application in order "to trick the insurer into
issuing a contract it would not otherwise issue."  Jensen & Leinberg, 33 ACTEC J. at 115.  These
transactions may sometimes be vehicles for money laundering schemes.  Id. at 119.

assure the relevant facts and issues will be adequately presented." <u>City of Irvine v. Irvine Citizens Against Overdevelopment</u>, 25 Cal. App. 4th 868, 874 (Cal. App. 4th 1994). "Standing rules for actions based upon statute may vary according to the intent of the Legislature and the purpose of the enactment." <u>Angelucci v. Century Supper Club</u>, 41 Cal. 4th 160, 175 (Cal. 2007).

      California intermediate appellate courts have concluded that the right to challenge whether a person has an insurable interest in a person's life resides with the insurer who wrote the policy rather than the estate or beneficiaries of the estate.[8]  In <u>Jenkins v. Hill</u>, 35 Cal. App. 2d 521, 522 (Cal. Ct. App. 1st Dist. 1939), the decedent had sought to name the plaintiff as beneficiary of his life insurance policy in order to compensate her for tending to his illness and burial.  The insurer refused on the grounds that the plaintiff lacked an insurable interest, but informed the decedent that policy proceeds would be paid to whoever held the policy at the decedent's time of death, or to any person who paid the policy premiums and/or tended to the decedent's well-being.  <u>Id.</u> at 522-23.  As a result, the estate was named beneficiary of the policy, and upon the policy's delivery, the decedent immediately made a gift of the policy to the plaintiff.  <u>Id.</u> at 523.  The plaintiff continued to care for the decedent, and she paid premiums on the policy, thereby complying with the insurer's conditions.  <u>Id.</u>

      Upon the decedent's death, however, proceeds were paid to the administrator of the estate, and the plaintiff sued for their recovery.  <u>Id.</u> at 522.  The court

---

[8] "'Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise . . . .'" <u>Pentech Int'l, Inc. v. Wall Street Clearing Co.</u>, 983 F.2d 441, 446 (2d Cir. 1993) (quoting <u>West v. American Int'l Telephone & Telegraph</u>, 311 U.S. 223, 236 (1940)).  The California Supreme Court does not appear to have spoken as to who may bring suit under California Insurance Code § 252, and no support has been presented for disregarding the holdings of California's intermediate appellate courts.

concluded that the plaintiff's conduct established an insurable interest in the decedent, according to the insurer's own terms and California statute, and the estate's administrator unlawfully failed to transmit the policy proceeds to the plaintiff.  Id. at 523-24.  It noted that the plaintiff and decedent "lived together as husband and wife, though without a legal marriage . . . ."  Id. at 524.  The court concluded that the estate administrator "could not attack" whether the plaintiff held an insurable interest in the life of the deceased.  Id. at 524.  It stated that there can be no "uncertainty" to the proposition "that the insurer is the only party who can raise the question of insurable interest, and that, if the insurer waives the question of interest and pays the money to the named beneficiary, or into court, neither the personal representative nor the creditors can claim the proceeds on that ground."  Id. at 524.  "[E]ither the [plaintiff] had an insurable interest in the life of the deceased or . . . she had such an interest that the [estate administrator] could not attack."  Id.

The holding of Jenkins is consistent with a long line of common-law precedent.  In Woodmen of the World v. Rutledge, 133 Cal. 640 (1901), the California Supreme Court held that the decedent's estate could not claim interest in life insurance proceeds paid to a beneficiary by an insurer.  It stated: "'The receipt of the person designated will discharge the insurer, and he may sue and recover the amount due at the maturity of the policy.  In such cases the legal representative of the insured has no claim upon the money, and cannot maintain an action therefor.  It forms no part of the assets of the estate of the insured.'"  Id. at 644 (quoting Winterhalter v. Workmen's Guarantee Fund Ass'n of San Francisco, 75 Cal. 245, 248 (1888)); see also Ezra Wheeler & Co. v. Factors' & Traders' Ins. Co. of New Orleans, 101 U.S. 439, 441 (1879) (in a dispute over

property insurance, questions of insurable interest "can only be urged by the insurance company . . . .").

Jenkins remains good law and continues to be cited by California courts. For example, in In re Marriage of Bratton, 28 Cal. App. 4th 791, 793-94 (Cal. Ct. App. 4th Dist. 1994), the court held that an ex-wife may retain ownership of a former husband's life insurance policy naming her as beneficiary following a divorce, even if the ex-husband whose life is insured objects to the arrangement. Bratton cited a provision of California's insurance code providing that an insurable interest "must exist when the insurance takes effect, but need not exist thereafter or when the loss occurs." Id. at 794 (quoting Cal. Ins. Code § 286; emphasis in original). As an alternate holding, the Bratton court concluded that the husband lacked standing to challenge his ex-wife's insurance policy on his life, and concluded that only the insurer can raise the question of insurable interest. Id. at 793-94. Relying on Jenkins, another intermediate court held that plaintiffs were barred from challenging whether the beneficiary had an insurable interest in proceeds of an earthquake property-damage policy, because the proceeds had already been paid and questions of insurable interest were properly raised only by the insurer. Countrywide Home Loans, Inc. v. Tutungi, 66 Cal. App. 4th 727, 732 (Cal. Ct. App. 2d Dist. 1998). See also Doty v. Allstate Ins. Co., 1991 WL 337619, at *4 (N.D. Cal. Nov. 4, 1991) (applying California law) ("As a general rule, only an insurer may raise the issue of an insurable interest.") (citing Jenkins, 35 Cal. App. 2d at 524); North American Co. for Life & Health Ins. v. Dzina, 64 Fed. Appx. 15, 18 (9th Cir. 2003) (unpublished opinion) ("Under California law the insurance carrier . . . is the only party with standing to challenge the lack of insurable interest.") (citing Jenkins, 35 Cal. App. 2d at 524).

Under <u>Jenkins</u>, its predecessor opinions, and its progeny, the plaintiffs do not have a right to sue under the California statutes prohibiting policy ownership by one without an insurable interest.  Plaintiffs are squarely in the category of plaintiffs that <u>Jenkins</u> bars from bringing a claim for payment of policy benefits.  This is in direct conflict with New York Insurance Law § 3205(b)(4), which, in the case of a dispute over insurable interest under a life insurance policy, permits an "executor or administrator" to bring action "to recover such benefits from the person receiving them."

Because New York statute recognizes the plaintiffs as having the right to assert such claims, and California law would not recognize the claims of the plaintiffs, an actual conflict exists between the laws of the two states.  I proceed to the next step of the conflict of laws analysis.  <u>Allstate Ins. Co.</u>, 81 N.Y.2d 225-26.

B.       Pursuant to the Grouping of Contacts Approach to a Choice of Law
         <u>Analysis, California Law Governs This Case.</u>

In a dispute based in contract, New York applies "[t]he 'center of gravity' or 'grouping of contacts' choice of law theory . . . ."  <u>Id.</u> at 226.  Under this approach, a court weighs "the spectrum of significant contacts," and identifies which contacts are to be given "heavy weight" in its analysis.  <u>Id.</u>  Considerations in a grouping of contacts analysis may include the place of contracting, the place of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.  <u>Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.</u>, 84 N.Y.2d 309, 317 (1994). The parties agree that the foregoing analysis governs this dispute.

Some disputes, though based in contract, also may implicate strong governmental interests.  <u>Id.</u> at 318-19.  In weighing these government interests, the analysis does not cross over to a "pure 'interest analysis' employed in tort cases."

<u>Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.</u>, 36 A.D.3d 17, 22 (1st Dep't 2006), <u>aff'd</u>, 9 N.Y.3d 928 (2007).   For example, <u>Allstate</u> noted that the "highly regulated" automobile insurance industry implicates both private economic interests and governmental interests in a regulatory scheme, therefore making consideration of state interests relevant to the choice-of-law question.  81 N.Y.2d at 226-27.  Government interests may include 1.) regulating conduct related to insured risks within a state's borders, 2.) assurance that a state's domiciliaries are fairly treated by insurers, 3.) assuring availability of insurance from companies located both within and without of state, and 4.) regulating insurer conduct within state borders.  <u>Certain Underwriters at Lloyd's</u>, 36 A.D.3d at 22 (citing <u>Fireman's Fund Ins. Co., Inc. v. Schuster Films, Inc.</u>, 811 F. Supp, 978, 984 (S.D.N.Y. 1993)).  Courts also should be mindful of the "'certainty, predictability and uniformity of result,'" and the "'ease in the determination and application of the law to be applied.'"  <u>Id.</u> at 23 (quoting Restatement (Second) of Conflict of Laws § 6(2)(f)).  Such goals are promoted by applying the law of an insured's domiciliary, which conforms to the parties' expectations at the time of contracting.  <u>Id.</u>

When the rights created by a life insurance contract are disputed, courts generally apply "the local law of the state where the insured was domiciled at the time the policy was applied for," since the domicile state often "has the dominant interest in the insured," and legislatures often seek "to protect the individual insured and his beneficiaries."  Restatement (Second) of Conflict of Laws § 192 & cmt. (c).  "[A]t least as a general rule, the insured should receive the protection accorded him by the local law of his domicil."  <u>Id.</u> at cmt. (c).[9]

_____

[9] <u>Johansen v. Confederation Life Ass'n</u>, 447 F.2d 175 (2d Cir. 1971), undertook a choice-of-law analysis to determine whether the laws of the United States or Cuba governed a life insurance contract.  Judge

In evaluating the parties' contacts to New York and California, I draw the following from the Complaint and the parties' documentary submissions integral to the allegations therein.  The plaintiff Trust is organized under the laws of California, and trustee Norman Felber resides in California.  (Compl. ¶ 12.)  Phyllis Moldaw resides in California, as does the Executor.  (Compl. ¶¶ 13-14.)  Stuart resided in California at the time of his death.  (Compl. ¶ 13.)  In the fall of 2004, meetings were held at the office of Seiler & Co., LLC in Redwood City, California, at which the participants discussed taking out policies on the life of Stuart and Phyllis Moldaw.  (Compl. ¶ 30.)  On January 18, 2005, Stuart Moldaw authorized the release of medical information to XE-R, with his signature witnessed by a notary public in San Mateo, California.  (Nawaday Dec. Ex. E.)

Both defendant LLCs are "organized" under Delaware law and have their principal places of business in New York.  (Compl. ¶¶ 15-16.)  Ross, who is a non-party to this action, is alleged to reside in New York, and non-party MR & Co. is alleged to be a Florida corporation with its principal place of business in New York.  (Compl. ¶¶ 18-19.)  Another non-party "conspirator," XE-R, LLC, is alleged to be organized under Delaware law, with its principal place of business in New York.  (Compl. ¶ 17.)  The transaction was initiated by Ross with a call placed from New York.  (Compl. ¶ 26.)  The Complaint also asserts that non-party MR & Co. negotiated, placed and drafted all of the underlying policies in New York, and that the premiums were paid from New York. (Compl. ¶¶ 103-06.)

---

Lumbard, writing for the majority, noted that in determining governing law, a court should "look to the domicile of the insureds themselves at the time they entered into the contract," and concluded that at the time the policy issued, the insureds were Cuban domiciliaries with all or most of their business and property in Cuba.  Id. at 179-80.  New York's grouping-of-contacts analysis required application of Cuban law.  Id. at 180.  In dissent, Judge Feinberg observed that rights under a life insurance contract are determined by the law of the jurisdiction of the insured's domicile, but suggested that the "rule is by no means ironclad, particularly in international cases."  Id. at 185 (citing Restatement (Second) of Conflict of Laws § 192.)

The parties also note the existence of several contractual choice-of-law provisions.  The Complaint asserts that all agreements underlying the transaction include a New York choice-of-law provision.  (Compl. ¶ 56.)  That assertion is belied by the defendants' submissions, which show that Stuart Moldaw agreed that two of his life insurance policies were to be governed by California law.[10]  (Nawaday Dec. Ex. A at 3.2; Nawaday Dec. Ex. B at 3.2.)  None of the other policies included a choice-of-law provision.  (July 22 Tr. at 31.)  By contrast, New York choice of law clauses are incorporated in promissory notes between MR & Co., Stuart, Phyllis and certain trusts; a loan agreement between XE Life, Moldaw Capital Partners, LLC and the Trust; a loan agreement between XE Life and MR & Co.; a loan agreement between XE-R and MR & Co.; LLC agreements between defendants and their "co-conspirators"; and the escrow agreement between XE Life, Stuart and Phyllis.  (Compl. ¶ 56.)[11]

Applying the center of gravity and grouping of contacts criteria, I conclude that California law governs this case.  The plaintiffs are all domiciled in California, and Stuart Moldaw was domiciled in California at the time the policy was issued and at the time of his death.  (Compl. ¶¶ 12-14.)  The initial face-to-face policy negotiations occurred in California.  (Compl. ¶ 30.)  At bottom, California plaintiffs claim an insurable interest in the life of a California domiciliary who agreed to enter a

---

[10] The two policies were issued by The Manufacturers Life Insurance Company (USA), and each provided a face amount of $5 million in coverage.  (Nawaday Dec. Exs. A & B.)  These documents incorporated into the Complaint by reference are properly considered on a motion to dismiss.  Int'l Audiotext Network, 62 F.3d at 72.

[11] Neither party asserts that the citizenship of any insurer is material to the outcome of this choice-of-law analysis.  Along with The Manufacturers Life Insurance Company (USA), it appears that policies were issued by Jefferson Pilot LifeAmerica Insurance Company, of Concord, NH (Nawaday Reply Dec. Ex. C); Phoenix Life Insurance Co., of Boston, MA (Nawaday Reply Dec. Exs. D-G); Sun Life Assurance Company of Canada (Nawaday Reply Dec. Ex. H); Lincoln Life & Annuity Co., of New York (Nawaday Reply Dec. Ex. I); MONY Life Insurance Company of America, of New York (Nawaday Reply Dec. Ex. J); and Metropolitan Life Insurance Co. (Nawaday Reply Dec. Ex. K).

transaction negotiated in California.  At least two of the policies issued on the life of

Stuart Moldaw contain a California choice-of-law provision.  These contacts to California

are more significant – particularly the domicile of the insured – than the New York

contacts cited by the plaintiffs.  It is true that the defendants maintain principle places of

business in New York, and various non-party "conspirators" are alleged to have a New

York presence, but they entered into a contract with Stuart, who lived and died in

California, and it is three California plaintiffs who allege that they were harmed.

        Applying the law of California to these allegations is consistent with New

York's grouping-of-contacts approach.  <u>See</u>, <u>e.g.</u>, <u>Zurich</u>, 84 N.Y.2d at 317-18 (applying

New York law when insured's principal place of business was in New York, policy was

issued in New York, and insurance company was an "adopted domestic" of New York

and New York governmental interests were central); <u>Eagles Ins. Co. v. Singletary</u>, 279

A.D.2d 56, 59 (2d Dep't 2000) (Virginia law governed insurance contract drafted to

conform to Virginia law and issued to a Virginia resident for an insured vehicle

principally housed in Virginia); <u>Allstate Ins. Co. v. Conigliaro</u>, 248 A.D.2d 293, 293-94

(1st Dep't 1998) (applying New York law when insureds were domiciled in New York

and negotiated contract in New York, but the insurance policy broker and insured vehicle

were located in Florida); <u>Madison Realty, Inc. v. Neiss</u>, 253 A.D.2d 482, 483-84 (2d

Dep't 1998) (Florida law governs real estate transaction in Florida even though broker

who initiated the transaction was located in New York).

        Relevant government interests also support application of California law

to this case.  <u>See</u> <u>Certain Underwriters at Lloyd's</u>, 36 A.D.3d at 22.  California has a

prerogative in regulating the conduct of insurers within its borders.  It also has an interest

in regulating the conduct of those who insure risks within the state and enforcing its

policy concerns as to the treatment of California domiciliaries by insurers. Its policy

interests are particularly strong when the insured risk is the life of one of its citizens.

Application of California law to this case also conforms with the goal of promoting

uniformity and simplicity in choice of law questions by applying the law of the

domiciliary and place of negotiation. See id.[12]

    Lastly, the plaintiffs' citation to choice-of-law provisions in various

transaction documents is unpersuasive. The plaintiffs have loosely characterized this

action as directed toward the "transaction" that resulted in the defendants benefiting from

underlying life insurance policies issued to Stuart Moldaw. Plaintiffs do not cite to any

over-arching, master agreement or explain why the choice-of-law provisions in certain of

the contracts are determinative of which law governs the dispute. They argue in

conclusory fashion that certain transaction documents with New York choice-of-law

provisions are more integral to the dispute than the insurance policies themselves, and

contend that these choice of law provisions should govern. They do not adequately

explain why this ought to be so. It would be a different matter if the plaintiffs were

bringing a breach of contract action under the provisions of one of the transaction

agreements with a New York choice-of-law provision. They are not. Here, plaintiffs are

cherry-picking from an assortment of choice-of-law clauses and argue that Claims One

and Two ought to be decided under New York law.

---

[12] California could rationally conclude that a decedent's estate should not benefit from an unlawful policy issued with the connivance of the decedent. It does not necessarily follow that because a person has no insurable interest and is not entitled to wager on a person's life that the illegal wager should nevertheless be honored, with the policy effectively rewritten to name the estate, trust or widow as beneficiary. California could make the public policy decision to limit the right to challenge to the insurer and, perhaps, state insurance regulators.

Because California law governs this action, and because California does not recognize the plaintiffs as having a right to challenge the defendants' insurable interest, Claims One and Two are dismissed.

II.     Phyllis's Claim Under California Family Code § 1100(b) is Time-Barred.

The Complaint repeatedly alleges that neither Stuart nor Phyllis Moldaw paid premiums on Stuart's life insurance.  According to the Complaint, "Stuart Moldaw never paid a single premium related to the Policies and never held a beneficiary interest in the Policies."  (Compl. ¶ 4.)  Indeed, no one with an insurable interest in Stuart's life ever paid a premium.  (Compl. ¶ 4.)  The Complaint indicates that Stuart was enticed in part to pursue the transaction because the Moldaws would not be required to pay any premiums or in any way cover the costs of the transaction.  (Compl. ¶ 32.)  Plaintiffs allege that the defendants and their "co-conspirators" paid all policy premiums.  (Compl. ¶¶ 62, 79, 106.)  Flying in the face of these specific factual allegations, the plaintiffs allege in Claim Three that "[p]remiums on the Policies were fully paid with the community funds of Stuart and Plaintiff Phyllis."  (Compl. ¶ 148.)

California Family Code § 1100(b) states in relevant part:

> A spouse may not make a gift of community personal property, or dispose of community personal property for less than fair and reasonable value, without the written consent of the other spouse.

Phyllis alleges that the transaction violated section 1100(b) because premiums were paid with community funds of Stuart and Phyllis, but that Stuart disposed of beneficial interest on the policies for less than fair and reasonable value without Phyllis's consent.  (Compl. ¶¶ 148-50.)

Under California law, "[a] policy of insurance on the husband's life is community property when the premiums have been paid with community funds."  Tyre v. Aetna Life Insurance Co., 54 Cal. 2d 399, 402 (1960); accord In re Marriage of Elfmont, 9 Cal. 4th 1026, 1039 (1995) (insurance policies obtained during marriage through community funds are community property); In re Marriage of O'Connell, 8 Cal. App. 4th 565, 577 (Cal. Ct. App. 6th Dist. 1992) ("Both spouses ordinarily have a community interest in the proceeds of an insurance policy to the extent it was acquired with community funds.").

Even though the factual premise of the community property claim contradicts much of the Complaint, Rule 8(d)(2), Fed. R. Civ. P., which was formerly codified at Rule 8(e)(2), "permits pleading inconsistent theories in the alternative." Kruse v. Wells Fargo Home Mortgage, Inc., 383 F.3d 49, 55 n.3 (2d Cir. 2004).  "'In light of the liberal pleading policy embodied in Rule 8(e)(2), . . . a pleading should not be construed as an admission against another alternative or inconsistent pleading in the same case . . . .'"  Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir. 1994) (ellipses in original) (quoting Molsbergen v. United States, 757 F.2d 1016, 1018-19 (9th Cir.), cert. dismissed, 473 U.S. 934 (1985)).

Whether, as paragraph 148 alleges, premium payments "were fully paid with the community funds" or whether, alternatively, premiums were paid by some combination of the defendants and their "co-conspirators" would appear to be information within the unique knowledge of the estate and the widow, Phyllis. Nevertheless, "'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'"  Twombly, 550 U.S. at 555 (quoting

Neitzke v. Williams, 490 U.S. 319, 327 (1989)).  In addition, the plaintiffs' assertion –

presumably based on knowledge within their possession – that premiums were paid

through community funds is a direct assertion of presently known fact, and not a

conclusory legal assertion of the type recently highlighted with skepticism in Iqbal, 129

S. Ct. at 1950.  I do note, however, that while Rule 8(d)(2) permits parties to plead

inconsistent factual allegations, an alternative pleading is nonetheless subject to the terms

of Rule 11, Fed. R. Civ. P.  See generally Wright & Miller: Federal Practice and

Procedure: Civil 3d § 1285.  "[A] pleader may assert contradictory statements of fact

only when legitimately in doubt about the facts in question."  American Int'l Adjustment

Co. v. Galvin, 86 F.3d 1455, 1461 (7th Cir. 1996).

Accepting as true the allegations set forth at paragraph 148 of the

Complaint, Phyllis's claim is nevertheless time-barred.  The parties do not disagree that a

claim under California Family Law § 1100(b) is governed by the three-year limitations

period set forth at California Code of Civil Procedure § 338(c).  According to paragraph

43 of the Complaint, "in October and November of 2004," "[o]wnership of the insurance

policies taken out on the lives of Stuart and Phyllis [was] then transferred to the newly

created limited liability companies."  (emphasis in original)  Accepting the Complaint's

allegations as true, any wrongful transfer of community property by Stuart first occurred

in November 2004, at latest.  (July 22 Tr. at 49.)  This action was filed on November 3,

2008, approximately one year after the statute of limitations expired under section 338(c).

The plaintiffs do not allege that Phyllis lacked knowledge of the policies' transfer.  The

limitations period began to run in October or November 2004, when, according to the

Complaint, Stuart first relinquished ownership of the policies.  (Compl. ¶ 43.)  That there

may have been subsequent transfers of the policies does not eliminate the fact of the first transfer of purported community property.  The claim is time-barred.

      III.     Defendants' Motion to Dismiss Based on the Releases Signed by Phyllis and <u>Stuart Moldaw is Denied.</u>

        Finally, the defendants have moved to dismiss this action based on certain releases signed by Stuart and Phyllis Moldaw.  Although the defendants initially argued in their papers that all claims should be dismissed on the basis of the release, at oral argument held on July 22, 2009, they acknowledged that the release only applies to claims brought by the Executor.  (July 22 Tr. at 2-3.)  The release states:  "I waive and release any legal claims that I might have of any kind arising out of any interest XEL may acquire as to a Policy under the agreements entered into connection with the premium financing referenced above."  (Nawaday Dec. Ex. E.)

        Typically, a release secured by Stuart would bind Stuart's estate.  Though still living, Stuart fully knew the nature of the transaction.  There remains the issue of whether the release would violate California public policy.  The release signed by Stuart would affect the rights of the estate and the executor in this case no more than the holding of <u>Jenkins</u> and related cases.  With or without the release, California does not recognize the estate as having a right to litigate an insurer's determination of insurable interest.  <u>See</u> <u>Jenkins</u>, 35 Cal. App. 2d at 524; <u>Woodmen of the World</u>, 133 Cal. at 644.  Nevertheless, because of the dismissal of all claims asserted by the Executor on behalf of the estate on other grounds, it is not necessary for me to decide whether Stuart's release bars the Executor's claims.

- 26 -

IV.     <u>Claims Four and Five are Dismissed.</u>

        Claims Four and Five seek declaratory relief, imposition of a constructive trust and an accounting to remedy the statutory violations set forth in Claims One, Two and Three.  Because Claims One and Two fail state a claim for underlying violations of the state statutes and Claim Three is time-barred, the plaintiffs' claims for equitable relief are dismissed.

CONCLUSION

        The motion to dismiss is GRANTED.  The Clerk is directed to enter judgment for the defendants.

        The Clerk is also directed to transmit by mail a copy of this Memorandum and Order to the New York State Superintendent of Insurance and to the California Insurance Commissioner.

        SO ORDERED.

                                         P. Kevin Castel
                             United States District Judge

Dated: New York, New York
       July 27, 2009